

**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No.   AZ-19-1028-FLB |
| UBALDO JUAREZ, | Bk. No.     0:17-bk-06277-BMW |
| Debtor. | |
| EDGAR TODESCHI; GEORGINA PONCE, | |
| Appellants, | |
| v. | **OPINION** |
| UBALDO JUAREZ, | |
| Appellee. | |

Argued and Submitted on July 18, 2019
at Phoenix, Arizona

Filed – August 21, 2019

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Brenda Moody Whinery, Chief Bankruptcy Judge, Presiding

Appearances:    William R. Richardson of Richardson & Richardson, P.C. argued for appellants Edgar Todeschi and Georgina Ponce; Thomas H. Allen of Allen Barnes & Jones, PLC argued for appellee Ubaldo Juarez.

—————

Before: FARIS, LAFFERTY, and BRAND, Bankruptcy Judges.

FARIS, Bankruptcy Judge:

## INTRODUCTION

Appellants Edgar Todeschi and Georgina Ponce (the "Creditors") appeal from the bankruptcy court's order confirming debtor Ubaldo Juarez's amended chapter 11[1] plan. They argue (in summary) that Mr. Juarez acted in bad faith and that his plan violated the "absolute priority rule."

The bankruptcy court held three hearings and comprehensively addressed the Creditors' objections to plan confirmation. We do not discern any error in the court's rulings. Accordingly, we AFFIRM. We publish because this appeal presents a question of first impression in this circuit: whether the "absolute priority rule" permits an individual debtor in a chapter 11 case to retain exempt property without making a commensurate "new value" contribution.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

2

**FACTUAL BACKGROUND**[2]

## A.     Prepetition events

### 1.     Mr. Juarez's financial arrangement with his girlfriend

Mr. Juarez is a licensed real estate broker. He worked with his longtime domestic partner, Leticia Arreola,[3] who is a real estate agent and his assistant. Mr. Juarez and Ms. Arreola initially worked at Realty Executives McConnaughay. All commissions that they earned were payable to Mr. Juarez and deposited into the couple's joint bank account. Ms. Arreola periodically withdrew the portion of the commissions that she had earned and deposited it into her personal bank account. In the twenty-two months prior to the petition date, Mr. Juarez or Ms. Arreola transferred over $72,000 from the joint account to Ms. Arreola.

Four months prior to the petition date, Mr. Juarez and Ms. Arreola left Realty Executives McConnaughay and began working with Realty Executives in Phoenix. Mr. Juarez managed a team that included Ms. Arreola and had discretion to determine the commissions for his team. During this time, Mr. Juarez and Ms. Arreola received separate paychecks.

---

[2] We exercise our discretion to review the bankruptcy court's docket, as appropriate. *See Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 725 n.2 (9th Cir. BAP 2008).

[3] Later in the proceedings before the bankruptcy court, Mr. Juarez's counsel represented that Mr. Juarez and Ms. Arreola had separated and were no longer a couple.

### 2. The loan from the Creditors

In 2011, the Creditors loaned Mr. Juarez the principal sum of $200,000. In or around 2014, the Creditors sued Mr. Juarez in Arizona state court for breach of contract, breach of good faith and fair dealing, unjust enrichment, negligent misrepresentation, fraud, and constructive trust. Mr. Juarez denied the allegations.

## B. Mr. Juarez's bankruptcy petition

Mr. Juarez filed his chapter 11 petition in June 2017 to address the costly litigation brought by the Creditors and a large federal and state tax liability arising from years of incorrect joint tax returns.

Mr. Juarez scheduled assets totaling approximately $365,000. Among his scheduled assets was his residence located in Yuma, Arizona. He reported that the residence was worth $300,000 and encumbered by a $156,000 lien. He claimed a $150,000 exemption in the residence.

He disclosed a ninety percent interest in UBLA Properties, LLC ("UBLA").[4] He had formed UBLA the day before filing his chapter 11 petition for the purpose of acquiring and holding title to a vacant lot in Yuma. He disclosed UBLA's equitable interest in the vacant lot, valued at $35,000. In January 2018, Mr. Juarez received a $10,000 distribution from UBLA, which he disclosed in his monthly operating report.

He scheduled liabilities totaling $673,749.77, of which $414,682.82

---

[4] Ms. Arreola owned the remaining ten percent membership interest.

was general unsecured debt. The remainder was largely state and federal tax liabilities.[5]

Mr. Juarez paid some of Ms. Arreola's personal expenses from the debtor-in-possession ("DIP") account postpetition. He also made various cash withdrawals postpetition that he did not explain in the monthly operating reports.[6]

The Creditors filed a proof of claim in the amount of $261,390.40.[7] Mr. Juarez did not object to the Creditors' claim.

## C.    The initial chapter 11 plans

Mr. Juarez filed a proposed plan and disclosure statement, followed by a revised plan and disclosure statement. Mr. Juarez proposed to make plan payments of approximately $3,446 per month. He would fund the plan using post-confirmation commission income.

---

[5] The plan identified an allowed priority tax claim held by the Arizona Department of Revenue totaling $10,325.99 and a general unsecured claim totaling $1,500.42. The Internal Revenue Service held an allowed priority tax claim totaling $53,350.81, a general unsecured claim totaling $6,691.20, and a secured claim totaling $74,610.14.

[6] At trial, Mr. Juarez admitted using the DIP account for some of his and Ms. Arreola's personal expenses, including travel, movies, clothes, and dining. He also acknowledged that he made certain cash withdrawals and wrote checks without disclosing them in his operating reports.

[7] The Creditors also filed an adversary proceeding (not at issue in this appeal), seeking a determination that their debt was nondischargeable under § 523(a)(2)(A). That case remains pending.

He proposed paying the state and federal tax claims over fifty-four months.

He proposed to pay Class 4 general unsecured creditors a total of $20,467.44 over five years. He also proposed to pay Class 4 creditors a $10,000 new value contribution, which would be provided by Ms. Arreola in the third year. If the funding source failed, Mr. Juarez pledged to sell his residence to make the $10,000 new value contribution.

The bankruptcy court approved the disclosure statement and scheduled a confirmation hearing.

The Creditors objected to the plan. They argued that the plan was not proposed lawfully and in good faith under §§ 1129(a)(2) and (a)(3) because they would recover only five percent of their claim, Mr. Juarez's postpetition expenses were excessive, and he failed to explain certain cash withdrawals. They also argued that the plan failed to include Ms. Arreola's income and assets, even though Mr. Juarez held her out as his "wife" and they shared bank accounts and household expenses.

They argued that the plan did not satisfy the "best interests of the creditors" test under § 1129(a)(7) because a hypothetical chapter 7 trustee would likely include Ms. Arreola's assets in the calculation of estate assets.

They contended that, under § 1129(a)(15), Mr. Juarez was not committing all of his disposable income to the plan.

Finally, the Creditors argued that the plan was not fair and equitable

under § 1129(b) because it did not satisfy the absolute priority rule or the new value exception. Mr. Juarez proposed to retain property under the plan, even though Class 4 creditors voted to reject the plan. They argued that there was neither "new" value because Ms. Arreola's contribution should be considered property of the estate nor "money's worth" because the contribution was "sufficiently unreliable."

The Class 4 creditors rejected the plan. Three Class 4 unsecured creditors voted in favor of the plan, but the Creditors, whose vote represented 96.87 percent of the Class 4 votes, voted against the plan.

The bankruptcy court held a hearing and a trial on plan confirmation and denied confirmation of the plan.

The bankruptcy court held that the plan was proposed in good faith under § 1129(a)(3). It ruled that Mr. Juarez's stated reasons for filing for bankruptcy protection – to address tax liabilities and costly state court litigation – were not improper on their face.

It rejected the Creditors' assertion that Mr. Juarez's failure to schedule certain assets amounted to bad faith. It accepted Mr. Juarez's testimony that his omission of a car that he owned – but was driven and maintained by his daughter – was inadvertent. The court also found that Mr. Juarez failed to report prepetition commissions but that he nevertheless deposited those commissions into his DIP account. It stated that the Creditors had provided no evidence in support of their argument

7

that Mr. Juarez had undervalued his interest in a boat.

The court found that Mr. Juarez had filed all of his monthly operating reports and supplemented them with complete bank statements. It agreed with Mr. Juarez that his failure to disclose what he did with certain cash withdrawals was inadvertent and stated that the Creditors failed to produce any evidence that his use of DIP funds was in bad faith.

The Creditors contended that Mr. Juarez had used UBLA to avoid bankruptcy court supervision. However, the bankruptcy court stated that Mr. Juarez's prepetition interest in the vacant lot was unclear, that he had properly disclosed his interest in UBLA, and that he had deposited money that he received from UBLA into his DIP account.

The court found nothing improper with the $72,000 that Mr. Juarez allegedly gave to Ms. Arreola prepetition. The court found that the transfer represented amounts that Ms. Arreola earned while working at Realty Executives McConnaughay. It further determined that Mr. Juarez should not have paid any of Ms. Arreola's expenses from his DIP account, but there was no evidence that the payments were made in bad faith. It overruled the Creditors' § 1129(a)(3) objection.

The bankruptcy court held that the plan was feasible under § 1129(a)(11). It found that Mr. Juarez could generate sufficient income to make his proposed plan payments of $3,446 per month and that his DIP

account balance had been rising steadily.

However, the court found two fatal flaws with the plan.

First, the bankruptcy court held that the plan did not comply with § 1129(a)(15)'s requirement that Mr. Juarez commit five years' worth of his projected disposable income to his unsecured creditors. The court concluded that Ms. Arreola was not Mr. Juarez's dependent and that her expenses could not be used to reduce the amount that Mr. Juarez was required to commit to the plan.

Second, the court held that Ms. Arreola's contribution of $10,000 to the plan in the third year did not satisfy the new value exception to the absolute priority rule under § 1129(b)(2)(B)(ii). The court considered whether the contribution was (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization, and (5) reasonably equivalent to the value or interest received.

The court easily concluded that the $10,000 contribution was "new," because it was funded from an outside source or Mr. Juarez's exempt assets.

The court further found that the proposed contribution was reasonably equivalent to the value or interest received because "all of the Debtor's non-exempt assets are encumbered by a federal tax lien; thus, the Debtor would be retaining encumbered assets in exchange for a $10,000 contribution."

9

The court determined that the proposed contribution was necessary, given that Class 4 creditors rejected the plan and Mr. Juarez needed to satisfy the absolute priority rule or new value exception.

However, the court concluded that the contribution was not "money or money's worth" because Ms. Arreola did not have the money as of the trial date and would only make the contribution in the third year.

It also found that the proposed contribution was not substantial. The $10,000 infusion represented only 3.2 percent of the total general unsecured debt. The court required the contribution to be five percent or greater of the total unsecured debt.

Based on the relatively small contribution and the timing of the contribution, the court concluded that Mr. Juarez did not satisfy the new value exception. Accordingly, it sustained the § 1129(b) objection.

## D.   The amended plan

Mr. Juarez filed an amended plan ("Amended Plan"). Notable changes included: (1) the increase of new value contribution from $10,000 to $15,000, which would be paid by Michael Gray, a business associate who sometimes lends Ms. Arreola money, by the effective date of the Amended Plan; and (2) modification of the payment to Class 4 general unsecured creditors to a total of $33,580 to be paid in four annual payments of $2,008 and the balance in the fifth year.

The bankruptcy court approved the disclosure statement. Only Class

4 rejected the Amended Plan.

The Creditors again objected to plan confirmation. In addition to the arguments raised in the earlier objection, they argued that Mr. Juarez continued to spend over $1,000 a month without disclosing the purpose of the expenditures. They alleged that he had suddenly begun transferring over seventy percent of his commissions to Ms. Arreola only eleven days before the petition date.[8] They also asserted that Mr. Juarez had improperly used DIP funds for Ms. Arreola's shopping at department stores.

The Creditors also argued that Mr. Juarez's assignment of his commissions to Ms. Arreola and his use of the DIP funds improperly decreased his disposable income under § 1129(a)(15).

The Creditors contended that the Amended Plan was unfair under § 1129(b) because it back-loaded payments and would not begin paying Class 4 creditors for almost a year. They argued that Mr. Juarez would retain all of his assets without fully paying unsecured creditors.

The bankruptcy court held a confirmation hearing on January 23, 2019. It declined to hear more evidence and overruled the objection from the bench.

---

[8] Mr. Juarez had discretion to assign commissions to his team members at Realty Executives. The Creditors' counsel prepared a chart summarizing the commission payments to Mr. Juarez and Ms. Arreola and argued that, beginning on May 26, 2017, Mr. Juarez improperly directed $86,771.96 of commissions to Ms. Arreola, while he collected only $34,864.57 (for a total of $124,048.53).

The court reiterated its ruling concerning §§ 1129(a)(2) and (a)(3) and stated that the Creditors did not offer any additional arguments that would change the court's earlier ruling or require an evidentiary hearing.

The court also rejected the Creditors' § 1129(a)(7) argument, holding that the Creditors did not raise this issue at the trial on the original plan (and that the relevant provisions of the Amended Plan were the same as the original plan).

The court held that the Amended Plan satisfied the court's concerns regarding § 1129(a)(15). It stated that Mr. Juarez "amended the budget . . . and followed the national guidelines with a couple of small exceptions that have been noted."

Finally, the court addressed the Creditors' objection under § 1129(b). The court noted that the Amended Plan satisfied its earlier concerns and that Mr. Juarez would make an additional payment upfront to the unsecured creditors. It held that the Amended Plan complied with all of the requirements under § 1129(b).

The court later entered a written order confirming the Amended Plan. The order addressed each element of §§ 1129(a) and (b).

The bankruptcy court held that the Amended Plan satisfied § 1129(a)(7) because it provided that the unsecured creditors would receive distributions worth at least as much as the amount that they would receive in a chapter 7 liquidation.

As to § 1129(b), the court stated that the Amended Plan provided that Mr. Juarez would "not receive or retain under the plan on account of a junior claim or interest any property. Instead, the Debtor retains property on account of an infusion of new value into the Plan. Such value has been determined [to be] sufficient for plan confirmation purposes."

The Creditors timely filed their notice of appeal.

**E.      Motion for stay pending appeal**

Shortly thereafter, the Creditors filed in the bankruptcy court a motion for stay pending appeal. They argued that they would be irreparably harmed in the absence of a stay, because Mr. Juarez would consummate the Amended Plan, rendering the appeal moot.

The bankruptcy court denied the motion, holding that (1) the Creditors were unlikely to succeed on appeal; (2) they would not suffer irreparable injury because the appeal would not be either constitutionally or equitably moot; (3) other creditors would necessarily be harmed by a delay in distributions; and (4) the public interest would not be served by granting the motion.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(L).

"We cannot exercise jurisdiction over a moot appeal." *Ellis v. Yu (In re Ellis)*, 523 B.R. 673, 677 (9th Cir. BAP 2014)(citations omitted). An appeal is

moot if events have occurred that prevent an appellate court from granting effective relief. *See Ederel Sport, Inc. v. Gotcha Int'l L.P. (In re Gotcha Int'l L.P.)*, 311 B.R. 250, 253-54 (9th Cir. BAP 2004). A case may become constitutionally, statutorily, or equitably moot. *Clear Channel Outdoor Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 33 (9th Cir. BAP 2008) ("In bankruptcy, mootness comes in a variety of flavors: constitutional, equitable, and statutory.").[9] The "party moving for dismissal on mootness grounds bears a heavy burden." *Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 677 F.3d 869, 880 (9th Cir. 2012) (quoting *Jacobus v. Alaska*, 338 F.3d 1095, 1103 (9th Cir. 2003)).

Mr. Juarez argues that this appeal is equitably moot because the Creditors did not seek a stay pending appeal and the Amended Plan has been substantially consummated.

Under the equitable mootness doctrine, we may "dismiss appeals of bankruptcy matters when there has been a 'comprehensive change of circumstances . . . so as to render it inequitable for this court to consider the merits of the appeal.'" *Rev Op Grp. v. ML Manager LLC (In re Mortgs. Ltd.)*,

---

[9] The Ninth Circuit has summarized the three types of mootness: "Constitutional mootness is jurisdictional and derives from the case-or-controversy requirement of Article III. Equitable mootness concerns whether changes to the status quo following the order being appealed make it impractical or inequitable to 'unscramble the eggs.' Finally, statutory mootness codifies part, but not all, of the doctrine of equitable mootness." *Castaic Partners, II, LLC v. Daca-Castic, LLC (In re Castaic Partners II, LLC)*, 823 F.3d 966, 968 (9th Cir. 2016) (citing *In re PW, LLC*, 391 B.R. at 33-35).

14

771 F.3d 1211, 1214 (9th Cir. 2014) (quoting *In re Thorpe Insulation Co.*, 677 F.3d at 880). "An appeal is equitably moot if the case presents 'transactions that are so complex or difficult to unwind' that 'debtors, creditors, and third parties are entitled to rely on [the] final bankruptcy court order.'" *Id.* at 1215 (quoting *In re Thorpe Insulation Co.*, 677 F.3d at 880). To determine whether an appeal is equitably moot:

> We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. If a stay was sought and not gained, we then will look to whether substantial consummation of the plan has occurred. Next, we will look to the effect a remedy may have on third parties not before the court. Finally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court.

*In re Thorpe Insulation Co.*, 677 F.3d at 881.

First, although the Creditors did not request a stay pending appeal from this Panel, they sought a stay from the bankruptcy court. This cuts against equitable mootness.

Second, the Creditors acknowledge that the Amended Plan has been substantially consummated because Mr. Juarez has begun making payments under the Amended Plan, including a $5,000 payment to the Creditors. This factor favors equitable mootness.

Third, a reversal of the confirmation order would affect third parties,

but there is no indication that the third parties would necessarily be negatively affected. Indeed, a reversal might result in a new plan that would make more money available for unsecured creditors. This does not favor equitable mootness.

Lastly, as the bankruptcy court correctly noted, this case is not so complex that it cannot unwind the transactions and require a further amended plan, if necessary. It would not be "inequitable" to consider the merits of this appeal. *See In re Mortgs. Ltd.*, 771 F.3d at 1214. This factor does not support equitable mootness.

Based on these four factors, we hold that this appeal is not equitably moot. Therefore, we have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Whether the bankruptcy court erred in confirming Mr. Juarez's Amended Plan because it:

(1) failed to satisfy the absolute priority rule under § 1129(b);

(2) failed to meet the "best interest of the creditors test" under § 1127(a)(7) and failed to address the effects of § 724(b);

(3) failed to satisfy §§ 1129(a)(2), (a)(3), and (a)(15) because Mr. Juarez improperly transferred the majority of his real estate commissions to Ms. Arreola and committed other acts of bad faith; and

(4) failed to satisfy §§ 1129(a)(2) and (a)(3) because Mr. Juarez created UBLA one day before the petition date for improper purposes.

16

**STANDARDS OF REVIEW**

We review the bankruptcy court's ultimate decision to confirm a chapter 11 reorganization plan for an abuse of discretion. *Computer Task Grp., Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 184 (9th Cir. BAP 2003). We apply a two-part test to determine whether the bankruptcy court abused its discretion. *United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc). First, we consider de novo whether the bankruptcy court applied the correct legal standard to the relief requested. *Id.* Then, we review the bankruptcy court's factual findings for clear error. *Id.* at 1262. We must affirm the bankruptcy court's factual findings unless we conclude that they are illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *Id.*

We review for clear error the bankruptcy court's findings regarding good faith, compliance with disclosure requirements, and best interest of the creditors. *See United States v. Arnold & Baker Farms (In re Arnold & Baker Farms)*, 177 B.R. 648, 653 (9th Cir. BAP 1994), *aff'd*, 85 F.3d 1415 (9th Cir. 1996) ("A bankruptcy court's property valuation, the 'good faith determination,' and 'best interests of creditors' determination are all findings of fact."); *see also In re Brotby*, 303 B.R. at 184 (good faith and disclosure requirements).

Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*,

17

606 F.3d 1189, 1196 (9th Cir. 2010). "To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Papio Keno Club, Inc. v. City of Papillion (In re Papio Keno Club, Inc.)*, 262 F.3d 725, 729 (8th Cir. 2001) (citation omitted). If two views of the evidence are possible, the court's choice between them cannot be clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985).

## DISCUSSION

### A. The bankruptcy court did not err in holding that the Amended Plan satisfied the new value exception to the absolute priority rule.

The Creditors argue that the Amended Plan is not "fair and equitable" under § 1129(b) because it fails to comply with the absolute priority rule and does not satisfy the new value exception. They contend that the bankruptcy court failed to determine that the new value was "reasonably equivalent" to the value received. We disagree.

Section 1129(b) provides that the court can only confirm a chapter 11 plan that is "fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129(a). In order to be "fair and equitable" to unsecured creditors, the plan must provide either (1) "that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim" or (2) that "the holder of

18

any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115 . . . ." § 1129(b)(2)(B).

In other words, if a class of unsecured claims does not accept a chapter 11 plan by the requisite majorities, the court can confirm it only if the plan either provides for full payment of the dissenting class or provides that no junior class will receive or retain anything under the plan. This last criterion is called the absolute priority rule. *Zachary v. Cal. Bank & Tr.*, 811 F.3d 1191, 1194 (9th Cir. 2016).

There are two important exceptions to the absolute priority rule. First, a debtor who is an individual may retain postpetition property and income from postpetition services. § 1129(b)(2)(B)(ii). Second, a junior class can receive or retain property on account of a "new value" contribution:

> The new value exception to the absolute priority rule allows junior interest holders (*e.g.* shareholders of a corporate debtor) to receive a distribution of property under a plan if they offer "value" to the reorganized debtor that is: (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received.

*In re Brotby*, 303 B.R. at 195 (citing *Bonner Mall P'ship v. U.S. Bancorp Mortg. Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 909 (9th Cir. 1993)); *see Sec. Farms v.*

19

*Gen. Teamsters, Warehousemen & Helpers Union, Local 890 (In re Gen. Teamsters, Warehousemen & Helpers Union, Local 890)*, 265 F.3d 869, 873 (9th Cir. 2001) ("Under the new value exception that this circuit recognizes, an equity holder may retain its interest only if it contributes sufficient new value to ensure successful reorganization.")(citations omitted).

The bankruptcy court found that the $15,000 contribution offered by Mr. Gray met each of the five elements. On appeal, the Creditors basically concede that the first four elements were met.[10] They make two arguments concerning the fifth element.

First, they argue that the bankruptcy court failed to value the property that Mr. Juarez proposed to retain to determine whether the value of that property was "reasonably equivalent" to the new value. We reject this argument. The bankruptcy court stated after the trial that "the proposed [$15,000] contribution is 'reasonably equivalent to the value or interest received' given that all of the Debtor's nonexempt assets are encumbered by a federal tax lien; thus, the Debtor would be retaining encumbered assets in exchange for a [$15,000] contribution." Thus, the bankruptcy court found that $15,000 was "reasonably equivalent" to the

---

[10] The Creditors argued for the first time in their reply brief that the contribution was not "new" because Mr. Gray received a postpetition payment of $10,500 from UBLA. We will not consider arguments that were not raised specifically and distinctly in the opening brief. *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).

equity in the assets. The bankruptcy court did not explicitly value each asset, but it was not required to do so. The Creditors offered no evidence at trial to challenge Mr. Juarez's valuation of his nonexempt assets, and the bankruptcy court was justified in rejecting their request at the final confirmation hearing for another evidentiary hearing where they failed to identify any new evidence that they would offer at such a hearing.

Second, on appeal, the Creditors argue that the new value contribution must be at least equal to the value, not just of the nonexempt assets, but also of the exempt assets. They contend that "even exempt property is not beyond the reach of the absolute priority rule." They cite two cases from other jurisdictions, *In re Gosman*, 282 B.R. 45 (Bankr. S.D. Fla. 2002), and *In re Ashton*, 107 B.R. 670 (Bankr. D.N.D. 1989), and urge us to accept the "better analysis" concluding that exempt assets are subject to the absolute priority rule.

This is a question of first impression in this circuit. The nonprecedential decisions are divided. *See In re Gbadebo*, 431 B.R. 222, 227 n.6 (Bankr. N.D. Cal. 2010) ("Courts differed as to whether an individual debtor could retain exempt property without violating the 'absolute priority' rule." (citing *In re Bullard*, 358 B.R. 541, 544-45 (Bankr. D. Conn. 2007) (holding that the debtor could retain exempt property because it was not property of the estate)). We hold that exempt property is not properly included within the phrase "any property" under the absolute priority rule.

21

We reach this decision for two reasons.

First, the absolute priority rule only comes into play if the debtor retains "any property . . . under the plan on account of [the debtor's interest] . . . ." We agree with the courts holding that a debtor does not retain exempt property either "under the plan" or "on account of the debtor's interest . . . ." Rather, the debtor retains exempt property due to the exemption statutes. The debtor would be entitled to the exempt property even if no plan were confirmed; therefore, it cannot be said that the debtor retains the exempt property "under the plan" or "on account of the debtor's interest."

Second, the Creditors' interpretation of § 1129(b) creates a conflict between that section and §§ 522(c) and (k). Those sections provide that, with certain exceptions that do not apply here, exempt property is not liable for the payment of prepetition claims or administrative expenses. Requiring a debtor to pay for exempt assets via a new value contribution would effectively make those assets available to creditors.

Cases from other jurisdictions support our view. For example, the bankruptcy court for the Eastern District of Wisconsin extensively considered this exact question and stated that, "once a debtor's exemptions have been approved, the exempt property is no longer property of the bankruptcy estate. Therefore, an individual debtor's exempt property does not fit within the third component [the determination whether the property

22

is retained 'on account of' the junior claim or interest], and retaining exempt property does not implicate the absolute priority rule." *In re Gerard*, 495 B.R. 850, 855 (Bankr. E.D. Wis. 2013) (citations omitted). It concluded that "the debtor's exempt property that has been removed from the estate prior to confirmation is not property that is received or retained 'under the plan' as required for application of the absolute priority rule." *Id.*; *see In re Brown*, 498 B.R. 486, 500 (Bankr. E.D. Pa. 2013), *aff'd,* 505 B.R. 638 (E.D. Pa. 2014) ("Property allowed as exempt, however, is retained because of section 522, independently of any plan provision or the confirmation process itself. Therefore, retention of exempt property is outside the scope of section 1129(b)(2)(B)(ii)." (citations omitted)); *In re Martin*, 497 B.R. 349, 352 (Bankr. M.D. Fla. 2013) ("Although some courts have held that even the retention of exempt property violates the absolute priority rule, the majority (and better reasoned) decisions disagree, concluding that the total liquidation of an individual Chapter 11 debtor's assets is not required in order to satisfy the absolute priority rule.")(citations omitted). We agree that the reasoning expressed in these cases is sound.

Thus, the bankruptcy court did not err in allowing Mr. Juarez to retain his exempt property without making a corresponding "new value" contribution.

**B.** **The bankruptcy court did not err in holding that the Amended Plan satisfied the best interest of the creditors test under § 1129(a)(7).**

The Creditors argue that the bankruptcy court erred in considering the best interest of the creditors. We reject this argument.

Under the best interest of the creditors test, "[s]ection 1129(a)(7)(A)(ii) requires bankruptcy courts to determine what creditors would receive under a hypothetical chapter 7 liquidation, and then compare that amount to what the same creditors would receive under a chapter 11 reorganization." *Schoenmann v. Bank of the West (In re Tenderloin Health)*, 849 F.3d 1231, 1237 (9th Cir. 2017). Section 1129(a)(7) requires that:

> (7) With respect to each impaired class of claims or interests –
>
> > (A) each holder of a claim or interest of such class –
> >
> > > (I) has accepted the plan; or
> > >
> > > (ii) **will receive or retain under the plan on account of such claim or interest property of a value**, as of the effective date of the plan, **that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7** of this title on such date . . . .

§ 1129(a)(7) (emphases added).

On appeal, the Creditors argue that the bankruptcy court "made no valuation determination" of amounts that unsecured creditors could

24

receive in a chapter 7 liquidation. They complain that the court "refused to conduct any hearing and never made an analysis of this issue."

To the contrary, the bankruptcy court held an evidentiary hearing, but the Creditors failed to raise the § 1129(a)(7) objection either in the pretrial statement or at the hearing. The Creditors additionally failed to offer any argument or evidence in support of their § 1129(a)(7) objection at the confirmation hearing for the Amended Plan. The bankruptcy court held that the Amended Plan "provides that each creditor not accepting the Plan will receive or retain property of a value, as of the Effective Date of the Plan, that is not less than the amount that each creditor would receive in a Chapter 7 liquidation."

The record supports this finding. The court had before it Mr. Juarez's schedules, to which he attested under penalty of perjury. He later testified in his declaration that the schedules were accurate. He also testified that "[t]he Plan provides for payment to unsecured creditors in excess of what they would recover in a Chapter 7 liquidation." The only contrary material that the creditors offered in their objection to the Amended Plan was an online valuation for Mr. Juarez's residence and a NADA valuation of the boat. Neither of these documents was authenticated or accompanied by a declaration and therefore neither was admissible.

Mr. Juarez's evidence showed that, in a chapter 7 liquidation, approximately $69,472 would be available for distribution to pay

25

Mr. Juarez's debts including administrative claims, the federal secured tax lien, the state and federal priority tax liens, and unsecured creditors. The federal secured tax lien ($74,610.14) and the chapter 7 commissions (approximately $7,550)[11] would more than consume the $69,472 available for distribution, leaving nothing for the unsecured priority tax claims ($63,676), let alone nonpriority unsecured creditors. The $33,580.51 offered to Class 4 creditors under the Amended Plan was more favorable to unsecured creditors than chapter 7 liquidation.[12]

The Creditors argue that, under § 724(b), if a chapter 7 trustee liquidated Mr. Juarez's residence, he or she could pay the federal taxes "from the proceeds of the sale of the otherwise exempt residence plus administrative costs." In other words, they believe that the $74,610.14 secured tax lien should be subtracted from the homestead exemption, rather than the $69,472 of available estate funds.

We reject this argument. Section 724(b) provides that, in a chapter 7 case, certain administrative expenses have priority over certain tax liens. It does not provide, nor does any other Code section provide, that secured

---

[11] This figure assumes that the trustee would not administer the house, because it has no equity after subtracting the homestead exemption. Therefore, we base our calculations on the $69,472 available for distribution plus the $17,337 lien on the Jeep Wrangler. *See* § 326(a).

[12] We assume, without deciding, that the accumulated chapter 11 administrative expenses (estimated at $86,000 to $98,000) were not included in the calculation. If they were, it would be even more clear that the Amended Plan satisfied the test.

tax claims must, or even may, be paid out of exempt assets before nonexempt assets. To the contrary, the secured tax lien is a prepetition claim against the estate and a § 502(b) allowed claim that must be paid out of available estate funds pursuant to § 726.

Moreover, the Creditors' calculations do not add up. Even accepting their incorrect premise that the secured tax lien is paid out of the exemption first, there would still be only $69,472 available to pay the trustee's fees (approximately $19,000)[13] and the unsecured priority tax claims ($63,676), leaving nothing for the unsecured creditors. In other words, the Creditors would still recover nothing in a chapter 7 liquidation.

Furthermore, § 724(b) does not permit a trustee to recover administrative expenses from exempt property. Section 522(k) specifically provides that exempted property "is not liable for payment of any administrative expense[,]" with certain exceptions not applicable here. § 522(k). The Creditors are patently wrong in claiming that exempt property can be used to pay for administrative expenses. *Cf. Law v. Siegel*, 571 U.S. 415, 422 n.2 (2014) (holding that exempt funds are only liable for administrative expenses under two narrow exceptions to § 522(k)).

The bankruptcy court did not err in overruling the Creditors'

---

[13] If we assume that the trustee administers the house to pay the secured tax lien, then we recalculate the trustee's commission to include the distributions on account of the mortgage and the tax lien, in addition to the $69,472 available for distribution and the $17,337 lien on the Jeep Wrangler. *See* § 326(a).

§ 1129(a)(7) objection.

## C. The bankruptcy court did not clearly err in its findings concerning the commission arrangement.

The Creditors argue that the bankruptcy court erred when considering the commissions that Ms. Arreola withdrew from Mr. Juarez's account. They argue that Mr. Juarez began transferring seventy percent of his commissions to Ms. Arreola shortly before the petition date and that he was not committing all of his disposable income to the Amended Plan. We discern no clear error.

Section 1129(a)(2) mandates for plan confirmation that "[t]he proponent of the plan complies with the applicable provisions of this title." § 1129(a)(2). "The section's primary purpose is to assure that the plan proponents have complied with the disclosure and solicitation requirements of §§ 1125 and 1126." *Pineda Grantor Tr. II v. Dunlap Oil Co., Inc. (In re Dunlap Oil Co., Inc.)*, BAP No. AZ-14-1172-JuKiD, 2014 WL 6883069, at *11 (9th Cir. BAP Dec. 5, 2014).

Relatedly, § 1129(a)(3) requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law." § 1129(a)(3). "Good faith in proposing a plan of reorganization is assessed by the bankruptcy judge and viewed under the totality of the circumstances. Good faith requires that a plan will achieve a result consistent with the objectives and purposes of the Code. It also requires a fundamental fairness in dealing

with one's creditors." *Stolrow v. Stolrow's, Inc. (In re Stolrow's Inc.)*, 84 B.R. 167, 172 (9th Cir. BAP 1988) (citing *Jorgensen v. Fed. Land Bank of Spokane (In re Jorgensen)*, 66 B.R. 104, 108-09 (9th Cir. BAP 1986)).

The Creditors contend that Mr. Juarez directed the majority of his commissions to Ms. Arreola shortly before the petition date. They claim that there is no proof that Ms. Arreola earned any of those commissions. Further, they argue that, once Mr. Juarez and Ms. Arreola moved to Realty Executives, they received separate paychecks and could not share Mr. Juarez's commissions. They claim that these facts show that Mr. Juarez purposefully misrepresented his income and did not act in good faith.

The bankruptcy court heard testimony from Mr. Juarez and Ms. Arreola regarding their commission-sharing arrangement. It credited their testimony. Although the Creditors provided evidence of the withdrawals, they did not establish that the sharing of commissions or withdrawals were improper. As the fact finder, the bankruptcy court was free to choose Mr. Juarez's evidence over the Creditors' evidence. Based on the facts in the record, the bankruptcy court did not clearly err.

Additionally, the Creditors argue that Ms. Arreola's sharing of Mr. Juarez's commissions necessarily meant that Mr. Juarez failed to commit all of his disposable income to the Amended Plan over five years. Section 1129(a)(15) provides:

(15) In a case in which the debtor is an individual and in which

the holder of an allowed unsecured claim objects to the confirmation of the plan –

> (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

> (B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

§ 1129(a)(15). In other words, if an allowed unsecured creditor objects to the plan, the debtor must commit all of his projected disposable income for at least five years.

The term "projected disposable income" is borrowed from § 1325(b)(1)(B); "disposable income" is defined in § 1325(b)(2) as monthly income minus certain reasonable expenses for support and maintenance obligations. *See United States v. Villalobos (In re Villalobos)*, BAP No. NV-11-1061-HKwJu, 2011 WL 4485793, at *8 (9th Cir. BAP Aug. 19, 2011). Courts must employ "a 'forward-looking' approach that takes into account known or nearly certain information about changes in a debtor's earning power during the plan period." *Danielson v. Flores (In re Flores)*, 735 F.3d 855, 861 (9th Cir. 2013)(citations omitted).

Mr. Juarez offered evidence that the money that Ms. Arreola withdrew from the joint account was her earned commissions, and the bankruptcy court was free to credit that evidence over any contrary evidence. Further, the record supports the bankruptcy court's findings concerning the calculation of expenses under § 1129(a)(15). These factual determinations are not clearly erroneous.

## D. The bankruptcy court did not clearly err in its findings concerning UBLA.

The Creditors contend that Mr. Juarez used UBLA to circumvent the bankruptcy process and acquire, hold, and sell property without bankruptcy oversight. They argue that his actions demonstrate bad faith and manipulation of the Bankruptcy Code. We again find no clear error.

The Creditors point to the fact that Mr. Juarez formed UBLA the day before filing his petition and gave Ms. Arreola a ten percent interest for no consideration. They also argue that UBLA received postpetition property in which Mr. Juarez had a prepetition interest and acquired and sold other real property. Mr. Juarez allegedly used UBLA to pay some of his and Ms. Arreola's prepetition unsecured debts, including payments to his accountant, Ms. Arreola's attorney, and Mr. Gray.

The bankruptcy court considered these arguments at trial and rejected them. The court found that there was no evidence that UBLA was improperly formed, funded, or operated. It also found that Mr. Juarez's

31

prepetition interest in the vacant lot was unclear, as the only testimony presented referred to a "handshake interest." The court noted that Mr. Juarez properly scheduled his ninety percent interest in UBLA and deposited the distribution he received from UBLA into his DIP account. Moreover, contrary to the Creditors' assertion on appeal, Ms. Arreola testified at trial that she contributed substantial sums to UBLA and that the ten percent membership interest reflected the work she would put into UBLA's operations.

The bankruptcy court credited Mr. Juarez's and Ms. Arreola's testimony regarding the formation, purpose, and operation of UBLA. The bankruptcy court's findings were not clearly erroneous.

## CONCLUSION

The bankruptcy court did not err in confirming Mr. Juarez's chapter 11 plan. Accordingly, we AFFIRM.