**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>ARTESIAN FUTURE TECHNOLOGY, LLC,<br>　　　　　　　　Debtor. | BAP No. NC-23-1046-SGB<br><br>Bk. No. 22-40396 |
| BRIAN QUINLIVAN,<br>　　　　　　　Appellant,<br>v.<br>ARTESIAN FUTURE TECHNOLOGY, LLC,<br>　　　　　　　Appellee. | **MEMORANDUM**[*] |

Appeal from the United States Bankruptcy Court
for the Northern District of California
Charles D. Novack, Bankruptcy Judge, Presiding

Before: SPRAKER, GAN, and BRAND, Bankruptcy Judges.

## INTRODUCTION

Unsecured creditor Brian Quinlivan appeals from an order confirming debtor Artesian Future Technology, LLC's ("AFT") liquidating plan and approving its compromise under Rule 9019[1] with AFT's principal

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[1] Unless specified otherwise, all chapter and section references are to the

and his parents, as well as the denial of his reconsideration motions. The compromise was an integral part of the plan.

This appeal is equitably moot. Quinlivan failed to request a stay pending appeal. Most of the plan's material provisions have been consummated and priority creditors have received distributions on their claims. These creditors would be adversely affected by reversal. Moreover, it would be impracticable to unwind the plan and compromise by attempting to claw back the payments made to these creditors required in any rescission. Accordingly, this appeal is hereby ORDERED DISMISSED as moot.

## FACTS[2]

### A. The rise and fall of AFT.

Prior to its bankruptcy filing, AFT was in the business of manufacturing custom computers for gaming and cryptocurrency mining. Noah Katz was AFT's sole owner, its managing member, and its chief executive officer. Both parties attribute AFT's apparently precipitous downfall to a live-streamed sweepstakes drawing AFT held. During the event, Noah denied a small internet streamer a prize. The disgruntled streamer's complaints about the event resulted in a plague of negative

---

Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

[2] We exercise our discretion to take judicial notice of documents electronically filed in the underlying bankruptcy case. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

social media publicity for AFT. As a result, in March 2022, AFT ceased operations and laid off its employees.

**B.    AFT's bankruptcy filing, the retention of a chief reorganization officer, and the sale of AFT's tangible assets.**

AFT filed a subchapter V petition under chapter 11 in April 2022. Mark Sharf was appointed to serve as subchapter V trustee. With bankruptcy court approval, AFT retained legal and financial professionals, as well as a chief reorganization officer, Dr. Edward Webb of BPM, LLC. Katz's parents provided AFT with a secured loan to retain Webb and the legal and financial professionals. The loan was secured by AFT's remaining assets, which included its computers and parts inventory and intangible assets like its name and customer list. According to Katz, there was no other available funding source to enable AFT to retain the necessary professionals.

The bankruptcy court approved an auction sale of AFT's inventory and equipment for $140,000, with the parents' lien attaching to the net sale proceeds.

**C.    AFT's plan and compromise with the Katz family.**

In July 2022, AFT filed its liquidating plan. Its key terms included: (1) payment in full of priority wage and benefit claims and consumer depositor claims; (2) payment in full of priority tax claims over five years; and (3) pro rata distribution of $50,000 to general unsecured creditors. Katz's parents were to fund the plan in exchange for any claims AFT might

3

hold against the Katz family or others.

In conjunction with the plan, AFT moved for authorization to settle any claims AFT might have against the members of the Katz family or others. AFT posited that absent the settlement, it would have insufficient funds to satisfy priority wage and benefit claims of $122,089 and customer deposit claims of $5,653.00. Moreover, there would be no funds to pay priority tax claims and general unsecured claims.

As part of the transaction, Katz's parents agreed to waive their $843,055.92 general unsecured claim. The parents also agreed to waive their secured claim of $398,425 and to relinquish their lien on the net proceeds from sale of AFT's tangible assets. Additionally, Katz agreed to waive his $535,597.71 general unsecured claim against AFT. This was said to represent the amounts he advanced to AFT, plus liabilities of AFT he guaranteed or assumed, less amounts AFT transferred to Katz. Though subsequent amendments to the compromise further refined the transaction, the core of the transaction never materially changed.

Webb filed a declaration in support of the compromise. Based on his review of AFT's records he could not identify any claims against the parents and believed that any claims against Katz would be complicated, expensive, and time consuming largely because Katz ran AFT's finances through his personal accounts ostensibly for tax purposes. Perhaps more importantly, Katz appeared destitute, lacked a job, and seemed unable to obtain a new one.

**D.    Quinlivan's objection, and the confirmation and compromise proceedings.**

In August 2022, Quinlivan objected to AFT's proposed plan. Quinlivan alleged that the plan and the settlement were nothing more than a bad faith attempt to wipe out the Katz family's personal liability to AFT's creditors. The objection is somewhat difficult to follow. Quinlivan contended that Katz's parents "floated" loans to AFT as part of a scheme to use a large amount of AFT's revenue (allegedly never reported) to fund the family's lavish lifestyle—instead of using AFT's revenue to pay its bills as they came due. He further claimed that the real purpose of the plan and settlement was to wrongfully enable the Katz family "to buy the alter ego claims so that Creditors like myself can not seek proper justice in civil court at a later date."[3] Quinlivan additionally alleged that AFT's "overall estimated profit was somewhere between $4.5m and $6.5m," though where all this money went had not been adequately or reasonably explained. Quinlivan suspected Katz placed AFT's revenues into undisclosed

---

[3] Quinlivan's statement regarding alter ego claims makes little or no sense—at least under California law. Alter ego doctrine is not a claim at all. It is a legal theory that sometimes enables a claimant to pierce the corporate veil and extend liability so that the creditor can seek to recover from the business entity's principal(s) on account of the business entity's liabilities to the claimant. *See Schaefers v. Blizzard Energy, Inc. (In re Schaefers)*, 623 B.R. 777, 784–85 (9th Cir. BAP 2020), *vacated upon dismissal of subsequent appeal as moot*, 2022 WL 3973920 (9th Cir. Aug. 31, 2022). By definition, the business entity's liabilities to creditors would not be claims belonging to the business entity against the principals, which is what the plan and compromise purported to release in exchange for the plan funding.

cryptocurrency accounts.[4]

As for AFT's financial records, Quinlivan claimed that he was being denied access to them and that in any event they must have been fabricated after the fact, as they "didn't previously exist in any organized fashion."[5] He further asserted that Webb was the only one permitted to review the books and records, and Webb had a clear conflict of interest because he was hired by the Katz family.

Quinlivan further challenged the notion that Katz's parents were not involved in the management and control of AFT. He stated that he personally was aware of the parent's participation in hiring and firing decisions. He also maintained that Katz continued to attempt to lure in additional customers (and their deposits) even as AFT's business fell apart.

In response to the objection, AFT pointed out in relevant part that "Mr. Quinlivan's suggestion to turn down Plan funding of some $590,000 by [the parents] in favor of an unfunded investigation of unspecified claims, is hardly reasonable and should be overruled." In addition, AFT represented that it had provided "a substantial volume" of financial records to Quinlivan's counsel, who for reasons that were not clear had not

---

[4] Quinlivan posited that AFT's claims against the Katz family should be "put up for auction." He also stated he had "reason to believe that no less than $3m of AFT's business revenue flowed through Noah Katz's personal [paypal] account. This is more than triple what the Debtor reported [as reflected in Webb's compromise analysis]."

[5] Quinlivan also filed a one-sentence "declaration" stating under penalty of perjury that his "statement" (presumably the plan objection) was "true and correct." At the time, this was the only evidence Quinlivan submitted in support of his opposition.

filed the plan objection on Quinlivan's behalf. Rather, Quinlivan had filed his initial submissions pro se. According to AFT, the same financial records also were provided to the subchapter V trustee.

The court held its first plan confirmation hearing on September 2, 2022. The subchapter V trustee opined based on the information he received from AFT and Quinlivan that the settlement appeared to be in the range of reasonableness. The court then summarized the plan funding Katz's parents agreed to provide: (1) an estimated $5,663 per month for five years to pay off priority tax claims; (2) relinquishment of its lien against the $140,000 in net sale proceeds from sale of AFT's tangible assets so that they could be used to pay off priority wage and benefit claims and customer deposit claims; and (3) $50,000 to be distributed to general unsecured creditors. The court also referenced a $50,000 credit balance on a credit card that Katz was agreeing to contribute to plan funding. The court observed that without the funding from the Katz family, there were little or no funds to either pay any creditors or perform a plan.[6]

The court also noted that Quinlivan could have taken Rule 2004 examinations and submitted evidence to support his positions but that he failed to do so. Rather, the only evidence submitted indicated that Webb had reviewed AFTs books and records and concluded that there were no claims against the Katz family that he was aware of that were both viable

---

[6] Though the court did not mention it at this point, Katz's parents also evidently committed to fund full payment of all administrative claims.

7

and collectable. The court further remarked that Quinlivan had failed to specify in his papers the nature of the claims he suspected AFT had against the Katz family.[7] It also noted that absent funding from Katz's parents, AFT had little or no money to do anything—including the investigation and pursuit of any claims against the Katz family.

Ultimately, however, the bankruptcy court stated that it would not approve the compromise and confirm the plan unless the proponents submitted a written and fully signed settlement agreement. The court continued the compromise and confirmation hearing for that purpose.

The parties then filed a series of declarations and supplemental briefs in which they attempted to flesh out their positions. AFT additionally submitted to the court the fully executed settlement agreement between AFT and the Katz family. For his part, Quinlivan claimed that Webb neither adequately investigated nor disclosed numerous internet sales transactions that AFT engaged in through various websites including Etsy, Patreon, and Twitch—or what happened to the proceeds from these transactions. Quinlivan also maintained that the parents' role in AFT's management was vastly understated.

The court held its second confirmation and compromise hearing on September 23, 2022. The court noted that the transaction struck it as more

---

[7] At the hearing, Quinlivan's counsel repeatedly refers to certain alter ego claims and derivative claims. He incorrectly used these terms as if they were interchangeable, and has never coherently explained what these claims are.

of a sale of claims than a settlement.[8] It also stated that it was unable to readily identify the claims being sold by the description of claims provided in the settlement.

At the hearing, Quinlivan argued in relevant part that any attempt to conduct formal discovery before debtor submitted its plan would have been premature and a needless waste. The court rejected this argument. It explained that the concerns Quinlivan raised regarding Webb's independence and allegiance gave him every reason to initiate Rule 2004 examinations. Instead, Quinlivan elected to forego the opportunity to substantiate his allegations that AFT revenues disappeared into the personal accounts of the Katz family. Still, given the court's lingering questions and concerns regarding the scope of the claims being sold, it set deadlines for further briefing and for AFT to amend the settlement agreement and plan to resolve the lingering issues. Both parties filed post-hearing briefs.

### E. The bankruptcy court's confirmation and compromise order.

On December 5, 2022, the bankruptcy court entered its order approving the compromise and confirming AFT's third amended plan. The court first acknowledged the funding offered by Katz's parents in the estimated amount of $600,000, which allowed the debtor to pay in full all

---

[8] Counsel for the parents asserted that notice of the compromise went out to the entire creditor body, so anyone who had any interest in making a competing bid had an opportunity to do so.

allowed priority and administrative claims, as well as a $50,000 distribution to unsecured creditors. The court also acknowledged the Katz family's agreement to waive their claims against the estate. It then turned its attention to what the parents were receiving in exchange for the plan funding. Under the plan, upon completion of all payments AFT would assign to the parents all claims then held by AFT against anyone else, including claims against the Katz family, which in turn included claims that creditors might assert derivatively on behalf of AFT against them.

As to the claims being released, the court relied on the evidence submitted by AFT that it had reviewed its records for avoidable transfer claims against the parents but found none. The court conceded that transfers to Katz were a closer call because of AFT's bookkeeping practices. But again, it relied on Webb's declaration testimony that ascertaining whether Katz received any avoidable transfers would require a forensic accountant who the estate had no means of paying.

The court then analyzed the settlement as both a compromise under Rule 9019 (citing *A & C Properties*) and as a sale of estate assets under § 363. It found that the transaction met both standards, relying again on Webb's testimony that the parents received no transfers and Katz was insolvent. According to the court, these factors greatly diminished the prospect of successful litigation. The court also concluded that the nature of the alleged claims being released had been adequately identified given the entirety of the parties' submissions: Katz and his parents failed to account for revenue

10

AFT received and instead used it for their own personal benefit.

The court also found that the compromise was in the best interest of creditors. Though the distribution to general unsecured creditors would be minimal, the court noted that the priority creditors would be paid in full. Furthermore, no creditors other than Quinlivan had objected to the compromise.

As for the sale aspects of the transaction, the court observed that no one, including Quinlivan, had offered any viable alternative to the settlement and plan. As the bankruptcy court explained: "Artesian is a defunct entity with no income stream and the bulk of its cash is someone else's cash collateral. Simply put, Artesian has no independent means to pay its creditors, and the bankruptcy estate turned to its only ready source of funds to propose the Plan." The court went on to reflect that despite the broad service of the compromise motion, it did not attract any overbids and no one had even sought to timely conduct Rule 2004 examinations to flesh out any suspicions regarding undisclosed and unaccounted for AFT assets and revenues.

The court further found that all criteria for plan confirmation were met.

F.    **Quinlivan's motions for reconsideration**.

Quinlivan filed two separate reconsideration motions, the second one immediately following denial of the first. Both motions largely recapitulated Quinlivan's previous arguments, which were rejected in the

11

court's confirmation and compromise order. Quinlivan attempted to submit new evidence with his motions in an effort to demonstrate that the Katz family had hidden substantial AFT assets and failed to account for revenue. But the bankruptcy court held that to the extent the evidence might have supported his position, Quinlivan had failed to demonstrate why this evidence had not been presented during the confirmation and compromise proceedings.

The bankruptcy court denied Quinlivan's first reconsideration motion on February 13, 2023. Quinlivan timely appealed on February 23, 2023. Quinlivan filed his second reconsideration motion on February 24, 2023, which the court denied on March 10, 2023.[9]

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A), (L) and (N). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Should this appeal be dismissed as equitably moot?

## STANDARD OF REVIEW

We review questions of equitable mootness de novo. *See Todeschi v. Juarez (In re Juarez)*, 603 B.R. 610, 619–20 (9th Cir. BAP 2019), *aff'd*, 836 F. App'x 557 (9th Cir. 2020); *Rosenstein & Hitzeman, AAPLC v. Eliminator*

---

[9] Quinlivan never amended his notice of appeal to include the denial of the second reconsideration motion. Nor did he order the transcript from the hearing on the second reconsideration motion where the court stated its reasons for the denial.

*Custom Boats, Inc. (In re Eliminator Custom Boats, Inc.)*, 2019 WL 4733525, at
*3 (9th Cir. BAP Sept. 23, 2019). When we review a matter de novo, we
consider it anew as if no decision previously had been rendered. *Kashikar v.
Turnstile Cap. Mgmt., LLC (In re Kashikar)*, 567 B.R. 160, 164 (9th Cir. BAP
2017).

## DISCUSSION

AFT has filed a motion to dismiss this appeal as equitably moot.
According to AFT, the effective date of its confirmed plan occurred on
December 21, 2022, and Katz's parents already have paid more than
$580,000 pursuant to the compromise and plan. These funds already have
been used to pay: (1) 27 creditors with priority wage and benefits claims
and consumer deposit claims totaling $159,657.16; (2) multiple priority tax
claimants, with $36,328.48 paid through March 2023 and an additional
$4,600 per month being paid since then; and (3) $370,971.31 in allowed
administrative claims owed to professionals. At no point did Quinlivan
request a stay pending appeal from either the bankruptcy court or this
Panel.

Whereas questions of mootness under Article III of the Constitution
implicate the court's jurisdiction and ask whether the court has the power
to adjudicate the matter brought before it, equitable mootness is a "judge-
made abstention doctrine." *Rev Op Grp. v. ML Manager LLC (In re Mortgs.
Ltd.)*, 771 F.3d 1211, 1214-15 (9th Cir. 2014). Equitable mootness asks
whether the court equitably **should** exercise its power to hear and resolve

13

the dispute. *See id.* It permits appellate courts to "dismiss appeals of bankruptcy matters when there has been a comprehensive change of circumstances so as to render it inequitable for this court to consider the merits of the appeal." *Id.* at 1214 (cleaned up) (quoting *Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 677 F.3d 869, 880 (9th Cir. 2012)). This doctrine fosters the public policy interest in the finality of bankruptcy court judgments and also protects parties not directly involved in the bankruptcy court litigation but whose interests would be adversely affected by reversal. *See id.* at 1218; *In re Thorpe Insulation Co*, 677 F.3d at 882.

In the plan confirmation context, the Ninth Circuit has held that the following factors should be considered in determining whether the appeal of the confirmation order is equitably moot:

> (1) whether a stay was sought, for absent that a party has not fully pursued its rights; (2) if a stay was sought and not gained, we then will look to whether substantial consummation of the plan has occurred; (3) we will look to the effect that a remedy may have on third parties not before the court; (4) finally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation before the bankruptcy court.

*In re Mortgs. Ltd.*, 771 F.3d at 1217 (cleaned up).[10]

---

[10] *Mortgages Ltd.* acknowledged that the Ninth Circuit's prior precedent was in conflict as to whether the equitable mootness analysis should be considered complete when the appellant fails to seek a stay pending appeal. *Id.* at 1215-18. It suggested that

In the instant appeal, each of these factors militates in favor of dismissing this appeal as equitably moot. First, Quinlivan failed to seek a stay pending appeal. By failing to do so, he slept on his rights and enabled circumstances to arise where a merits determination in this appeal could jeopardize the vested interests of innocent third parties, specifically the priority creditors who received payment of their wage, benefit, and consumer deposit claims pursuant to the terms of AFT's confirmed plan. Under similar circumstances, the Ninth Circuit has held that this factor militates in favor of dismissing the appeal as equitably moot. *Id.* at 1217-18.

Second, no dispute has been raised here regarding substantial consummation of AFT's plan. The plan payments made to priority and administrative creditors militate in favor of equitable mootness. *See In re Juarez*, 603 B.R. at 620.

As to the third and fourth equitable mootness factors, we cannot conceive of how we could fashion effective and equitable relief if Quinlivan were to prevail on appeal. Reversal would require the bankruptcy court to unwind both the plan and the compromise on which it is based. This necessarily would require the return of the settlement funds to Katz's parents. But AFT has distributed those funds and is defunct. It has no means to repay the settlement and realistically no ability to seek the funds

---

in most instances, the failure to seek a stay should render the appeal of a confirmation order equitably moot. *Id*. But it went on to consider all four equitable mootness factors as if the appellant therein had sought a stay pending appeal, even though it did not. *Id.* at 1217-18. We will follow the same process here.

from its creditors. To do so would require AFT to obtain and enforce an order or judgment against all priority and administrative claimants to return the funds paid to them. Not only would clawing back these funds adversely affect the "innocent" priority claimants, it would be impracticable to recover such funds in many instances. *See In re Mortgs. Ltd.*, 771 F.3d at 1217-18.

Quinlivan has opposed the motion to dismiss. But nothing in his opposition counters the facts and law set forth above in our equitable mootness analysis. Instead, he largely focuses on the perceived merits of his appeal and baldly assumes that the claims assigned to Katz's parents can be clawed back without returning the plan funds. He further assumes that his allegations of misconduct and the parents' status as insiders justifies the forfeiture of their plan funding. We disagree. We are not aware of any authority that would support Quinlivan's position, and he has not cited any. Consistent with our mootness analysis, we perceive no grounds that would equitably permit us to unwind the plan and the compromise in whole or in part.

Quinlivan cites only one case in support of his opposition to the motion to dismiss—*First Southern National Bank v. Sunnyslope Housing Ltd. Partnership (Sunnyslope Housing Ltd. Partnership)*, 2012 WL 603573 (9th Cir. BAP Feb. 1, 2012). He argues that *Sunnyslope* stands for the proposition that "[a] stay pending appeal is discretionary and is not a basis for mootness." Aplt's opp. to AFT's dismissal motion at p. 12. But *Sunnyslope* does not

even mention mootness—equitable or constitutional. Applying the relevant factors, our equitable mootness analysis demonstrates that each factor justifies dismissal of this appeal as equitably moot.[11]

## CONCLUSION

For the reasons set forth above, we DISMISS this appeal as equitably moot.

---

[11] Even if we were to reach the merits, we would affirm. AFT was a defunct corporation with no unencumbered assets that could be used to fund a plan, finance an investigation, or litigate with the Katz family. In addition, despite ample opportunity to do so, no one demonstrated any interest in committing their own funds to pursue the Katz family on behalf of AFT. Quinlavan is willing to risk the limited plan payment that he and others received under the compromise for a more robust investigation. Yet, the bankruptcy court reasonably concluded that the circumstances of the bankruptcy supported the settlement in the best interests of the creditors, given what was known based on the available information. The debtor elected to pursue chapter 11 and proposed its plan of liquidation. On the record before us, we would not conclude that the court abused its discretion when it confirmed AFT's plan, approved its compromise, and rejected Quinlivan's opposition thereto. *See generally Spark Factor Design, Inc. v. Hjelmeset (In re Open Med. Inst., Inc.)*, 639 B.R. 169, 180 (9th Cir. BAP 2022), *aff'd in two separate decisions*, Case No. 22-60017, 2023 WL 7123763, Case No. 22-60018, 2023 WL 7122577 (9th Cir. Oct. 30, 2023).