NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>FARWEST PUMP COMPANY,<br>　　　　　　　Debtor. | BAP No. AZ-19-1274-LBT |
| FARWEST PUMP COMPANY,<br>　　　　　　　Appellant,<br>v.<br>OFFICIAL COMMITTEE OF<br>UNSECURED CREDITORS; DOUGLAS<br>DUNLAP; CHRISTINE DUNLAP; HIGH<br>DESERT IRRIGATION; ANC ORCHARD<br>LLC; BMR III, L.P.; THE MORGAN ROSE<br>RANCH, L.P.; DAVID J. LEONARD, PLC;<br>MINERA HARTELPOOL, S. DE R.L. DE<br>C.V.,<br><br>　　　　　　　Appellees. | Bk. No. 4:17-bk-11112-BMW<br><br>MEMORANDUM* |

Appeal from the United States Bankruptcy Court
for the District of Arizona
Honorable Brenda Moody Whinery, Chief Bankruptcy Judge, Presiding

Before: LAFFERTY, BRAND, and TAYLOR, Bankruptcy Judges.
Memorandum by Judge Lafferty
Concurrence by Judge Taylor

---

*This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

# INTRODUCTION

Chapter 11[1] debtor Farwest Pump Company appeals the bankruptcy court's order confirming the plan of liquidation proposed by appellee Official Committee of Unsecured Creditors ("Committee") and denying confirmation of Debtor's plan of reorganization. The bankruptcy court denied confirmation of Debtor's plan on the grounds that: (1) the continued management of Debtor by its principals was inconsistent with the interests of creditors and public policy; (2) it did not meet the best interests of creditors test; (3) it was not feasible; and (4) the principals' proposed new value contribution was inadequate to satisfy the absolute priority rule. The bankruptcy court overruled Debtor's objections to the Committee's plan that it did not satisfy the best interests of creditors test and that it lacked feasibility.

The bankruptcy court did not abuse its discretion in denying confirmation of Debtor's plan. But with respect to the Committee's plan, the bankruptcy court erred in failing to make specific findings regarding whether it met the best interests of creditors test under § 1129(a)(7). It thus abused its discretion in confirming the Committee's plan.

Accordingly, we AFFIRM in part, VACATE in part, and REMAND.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

## FACTUAL BACKGROUND

### Pre-Petition Events

Debtor is a corporation owned by Clark Vaught and his spouse, Channa Crews-Vaught. Ms. Crews-Vaught is Debtor's president, and Mr. Vaught is the manager; they are Debtor's only employees. Debtor's original business was well drilling and pump installation.

In 2013, the Vaughts discovered that Debtor's vice president, Joel Rodriguez, was embezzling money from Debtor. Because of the criminal investigation that followed, Debtor fell behind on its accounting and had to spend significant time, pre- and post-petition, reconciling its books. Debtor filed a civil lawsuit against Mr. Rodriguez and others and began pursuing crime insurance claims.

In the months leading up to Debtor's bankruptcy filing, it was unable to obtain liability insurance necessary to continue to operate as a well drilling contractor. Further, a judgment in the approximate amount of $900,000 was entered against Debtor in California Superior Court. Debtor thereafter cancelled several of its licenses and adjusted its business model to performing consulting work for well drilling, pump design, and electrical design, and leasing equipment to a related entity, Vaught Equipment.

Vaught Equipment is owned by the Vaughts and Ms. Crews-Vaught's daughter's trust. It has no employees, and its only business is

3

holding and leasing equipment. Vaught Equipment leases equipment from Debtor and then subleases that equipment only to related entities Reliant Well Drilling and Pump Corporation ("Reliant") and FARCO Perforaciones y Bombeo, S.A. De C.V. ("FARCO").

Reliant is a well drilling and pump company. Reliant is owned by Mr. Vaught. Although it was formed in 2013, Reliant did not begin doing business until April 2017, performing the work that Debtor used to perform, using Debtor's equipment.

FARCO is a Mexican entity formed in 2010 that is owned by the Vaughts. FARCO does drilling, pump installation, test pumping, and related work. FARCO has acquired and leased equipment from Debtor, and FARCO currently leases equipment from Vaught Equipment.

**Post-Petition Events**

Debtor filed its chapter 11 petition on September 20, 2017. The Committee was appointed shortly thereafter. Debtor and the Committee each filed proposed plans and disclosure statements. The bankruptcy court approved both disclosure statements and set confirmation hearings on the competing plans.

**Debtor's Plan**

Debtor's plan is a plan of reorganization, under which the Vaughts would continue to own and manage Debtor in exchange for an equity contribution, and they would be compensated for rendering professional

4

services to Debtor post-confirmation. Debtor's plan provides for the payment of priority and secured claims in full over time. General unsecured creditors would be paid a pro rata share of annual distributions over six years and would recover approximately 40.75 on their allowed claims.

Debtor proposes to fund its plan through the Vaughts' new value contribution of $140,000, cash flow from continued operations as a leasing and consulting business, asset sales, and litigation proceeds.

One impaired class voted in favor of Debtor's plan, the "Leonard Class," the allowed claim of attorney David Leonard, who formerly represented Debtor in connection with its crime insurance claims and whose claim was partially secured. Treatment of that class was resolved with a court-approved settlement between Debtor and Mr. Leonard. All other impaired classes voted to reject Debtor's plan.

**The Committee's Plan**

The Committee's plan is a liquidating plan under which all estate property would vest in a liquidating plan trust to be administered by the Committee's counsel, who would serve as liquidating plan trustee. The Committee's plan would be funded through the liquidation of estate property, the collection of accounts receivable, the collection of lease payments, and the pursuit of other litigation claims. The Committee's plan proposes to have the liquidating trustee evaluate Debtor's unexpired

personal property leases, assume those that are profitable, reject those that are not profitable, and sell the underlying equipment that is the subject of any rejected lease.

Under the Committee's plan, to the extent funds are available, holders of allowed general unsecured claims would receive pro rata quarterly distributions from the liquidating trust. The Committee's plan includes a purchase option that would allow the Vaughts to purchase the liquidating trust's interest in all estate property.

All voting classes except allowed priority tax claims and the Leonard Class voted to accept the Committee's plan. But no party asserted any priority tax claims, and none were anticipated.[2] And the Committee modified its plan so that the Leonard Class would receive the same treatment as under Debtor's plan.[3]

During the interim between approval of the disclosure statements and the confirmation hearing, all objections to Debtor's plan were resolved except for the Committee's. The Committee objected to Debtor's plan on

---

[2]Pima County was listed in Debtor's amended schedules with a disputed claim for 2017 property taxes in an unknown amount, and it was included on the creditor mailing matrix. The County did not file a proof of claim or otherwise participate in the bankruptcy except for the filing of a notice of appearance by its counsel. The County nevertheless returned ballots rejecting the Committee's plan and accepting the Debtor's, even though both plans treated priority tax claims as unimpaired.

[3]Mr. Leonard agreed to a $200,000 secured claim (to be paid with 50 percent of insurance proceeds until paid in full), and a $243,762.94 general unsecured claim.

grounds that (I) it was not proposed in good faith as required by § 1129(a)(3); (ii) the Vaughts' continued management of Debtor was inconsistent with the interests of creditors and public policy in violation of § 1129(a)(5); (iii) Debtor's plan failed to satisfy the best interests of creditors test set forth in § 1129(a)(7); (iv) Debtor's plan was not feasible as required by § 1129(a)(11); and (v) the proposed new value contribution was inadequate and failed to satisfy the absolute priority rule in § 1129(b).

Debtor objected to confirmation of the Committee's plan on the grounds that: (I) it failed to satisfy the best interest of creditors test set forth in § 1129(a)(7); and (ii) it was not feasible as required by § 1129(a)(11).

The court held a trial over three days in May 2019, after which the parties submitted post-trial briefing and presented closing arguments. In October 2019, the court issued its Memorandum Decision Regarding Plan Confirmation ("Memorandum") and an order confirming the Committee's plan and denying confirmation of Debtor's plan. It overruled all Debtor's objections to the Committee's plan and the Committee's good faith objection to Debtor's plan. But the court sustained the Committee's remaining objections.

Debtor timely appealed.[4]

---

[4]Debtor also moved for a stay pending appeal, which the bankruptcy court denied, in part because the effective date of the Committee's plan is the date by which the confirmation order becomes a final, non-appealable order. The bankruptcy court

(continued...)

7

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(L). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Whether the bankruptcy court abused its discretion in denying confirmation of Debtor's plan.

Whether the bankruptcy court abused its discretion in confirming the Committee's plan.

## STANDARDS OF REVIEW

We review the bankruptcy court's decision to confirm a chapter 11 plan for an abuse of discretion. *Marshall v. Marshall (In re Marshall)*, 721 F.3d 1032, 1045 (9th Cir. 2013); *Computer Task Grp., Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 184 (9th Cir. BAP 2003).We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *Bronitsky v. Bea (In re Bea)*, 533 B.R. 283, 285 (9th Cir. BAP 2015). De novo means that we review a matter anew, as if no decision previously had been rendered. *Dawson v. Marshall*, 561 F.3d 930, 933 (9th Cir. 2009).

We must affirm the bankruptcy court's factual findings unless we determine that those findings are "(1) 'illogical,' (2) 'implausible,' or

---

[4](...continued)
interpreted this language to prevent the Committee's plan from going effective during the pendency of this appeal, so that no irreparable injury would result from denial of a stay.

(3) 'without support in inferences that may be drawn from the facts in the record.'" *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 577 (1985)). Under the clearly erroneous standard of review, if the bankruptcy court's findings are plausible in light of the record viewed in its entirety, we may not reverse even if we would have weighed the evidence differently. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574 (citations omitted).

A bankruptcy court abuses its discretion if it applies an incorrect legal standard or misapplies the correct legal standard, or if its factual findings are illogical, implausible or not supported by evidence in the record. *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 832 (9th Cir. 2011).

## DISCUSSION

Debtor contends that the bankruptcy court abused its discretion in rejecting its plan and confirming the Committee's plan.

Regarding rejection of Debtor's plan, Debtor argues that the court erred: (1) in finding that the Vaughts' continued management of Debtor was inconsistent with the interests of creditors and public policy; (2) in finding that the plan failed the best interest of creditors test even though Mr. Leonard testified that without the Vaughts' participation, it was unlikely that he or a trustee would be able to recover any money to benefit

9

creditors; (3) in relying on the post-trial record in finding Debtor's plan not feasible; and (4) in finding the effective date contribution to be insufficient.

As for confirmation of the Committee's plan, Debtor argues that the court erred: (1) by concluding that the "best interest of creditors" test under § 1129(a)(7) was inapplicable to a liquidating plan; and (2) by concluding that § 1129(c) weighed in favor of confirming the Committee's plan.

## A. The bankruptcy court did not abuse its discretion in denying confirmation of Debtor's plan.

### 1. The bankruptcy court did not err in finding that the retention of Debtor's current management was not consistent with the interests of creditors and with public policy, as required under § 1129(a)(5).

A chapter 11 plan may not be confirmed if the continuation in management of the persons proposed to serve as officers or managers of debtor is not in the interests of creditors and public policy. *See* § 1129(a)(5)(A)(ii); *In re Bashas' Inc.*, 437 B.R. 874, 912 (Bankr. D. Ariz. 2010) "Indeed, continued service by prior management may be inconsistent with the interests of creditors and public policy if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor." *Id.* (citing *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003); *In re Sherwood Square Assocs.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989); *In re SM 104 Ltd.*, 160 B.R. 202 (Bankr. S.D. Fla.1993)).

10

The bankruptcy court sustained the Committee's objection to the Vaughts' continued management of Debtor, based on the following factual findings:

- Under the Vaughts' management, Debtor had (1) failed to file accurate or timely operating reports, and (2) failed to enforce its leases with Vaught Equipment, which caused Debtor's accounts receivable to "skyrocket" from $162,754.90 as of the petition date to $408,009.95 as of September 30, 2019.

- Despite the fact that Debtor relied almost entirely on Vaught Equipment and related entities to generate income, the Vaughts refused to disclose documents about the financial health of their related entities in violation of the court's orders granting applications for Rule 2004 examinations.

- During the pendency of the bankruptcy case, the Vaughts directed the transportation of Debtor's most valuable piece of equipment to Mexico, in direct contravention of the court's order.

- The business structure of related entities set up by the Vaughts gave them complete control over the flow of income to Debtor, and appeared to be an attempt to insulate Reliant and FARCO from collection efforts by Debtor or its creditors.

Ultimately, the bankruptcy court found that "[t]he evidence presented in this case reflects that the Vaughts have at best displayed

incompetence in operating and managing Debtor, and at worst have put their personal interests and the interests of their related entities ahead of the Debtor's fiduciary duties to the estate and its creditors." Accordingly, it found that the Vaughts' continued management of the Debtor was not in the best interest of creditors or public policy.

Debtor does not dispute any of the findings underlying the bankruptcy court's ultimate conclusion that § 1129(a)(5) was not satisfied, but it points to other evidence in the record that it contends supports the opposite conclusion. Debtor points out that despite major setbacks–the Rodriguez embezzlement, the 2017 entry of a $900,000 judgment against Debtor, and tragic events involving the Vaughts' daughter and her boyfriend–Debtor increased funds in its bank accounts during the chapter 11 case from $1,037.70 on the petition date to $99,238.85 as of April 2019, and it made $466,671.88 in adequate protection payments through September 2019. Debtor also points out that it obtained a $750,000 settlement of the $900,000 judgment. Finally, it points to Mr. Leonard's deposition testimony that Ms. Vaught had done "a magnificent job" in compiling information for the crime insurance claims, and that it would be extremely difficult for a third party to come in and take over that work without her participation.

While this evidence may weigh against the bankruptcy court's § 1129(a)(5) finding, there is ample evidence in the record to support it.

Under the clearly erroneous standard of review, so long as the bankruptcy court's findings are plausible in light of the entire record, we are not at liberty to re-weigh the evidence. Debtor has not shown the bankruptcy court's finding on this issue was illogical, implausible, or without support in the record.

> **2.    The bankruptcy court did not err in finding that Debtor's plan did not satisfy § 1129(a)(7).**

Section 1129(a)(7)[5] requires, if all creditors have not accepted the plan, that the plan proponent demonstrate that non-accepting impaired classes of creditors would receive as much under the plan as they would in a chapter 7 liquidation. *See Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 657 (9th Cir. 1997); *In re Bashas' Inc.*, 437 B.R. at 914. Accordingly, the bankruptcy court must make specific findings to determine whether each non-accepting claim holder in the impaired classes would receive at least as much under the plan as it would have received in a chapter 7 proceeding. *See In re Ambanc*

---

[5]That subsection provides:

(7) With respect to each impaired class of claims or interests--
     (A) each holder of a claim or interest of such class--
          (I) has accepted the plan; or
          (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]

*La Mesa Ltd. P'ship*, 115 F.3d at 657; *see also In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992) (the best interests test focuses on individual creditors rather than classes of claims, and the liquidation analysis applies only to non-accepting impaired claims or interests. If a class of claims or interests unanimously accepts the plan, then the best interests test is automatically satisfied for all members of that class).

In its analysis of the best interests test, the bankruptcy court initially noted that the parties' hypothetical liquidation analyses contained in their respective disclosure statements had become outdated, and that Debtor had submitted an updated liquidation analysis using figures from its expert's appraisal report, which had been admitted into evidence at trial. Accordingly, the court used the plan proponents' respective liquidation analyses and trial testimony to create its own liquidation analysis. The court valued Debtor's total crime insurance claims at $700,000, based on Debtor's scheduled value of $750,000 and its observation that the monthly operating reports had not shown any substantial payout on those claims. As discussed below, the court estimated that one-half of this amount, $350,000, would be collected in a hypothetical chapter 7 liquidation. Overall, it concluded that general unsecured creditors would recover 48.35 percent of their claims in a chapter 7 liquidation. Because it found that Debtor's plan would yield an approximate 40.75 percent distribution for

general unsecured creditors, the court concluded that Debtor's plan did not satisfy the best interests test.

Debtor contests this finding; it argues that the court's $350,000 hypothetical liquidation value of Debtor's crime insurance claims was implausible and not supported by the record. Debtor's updated liquidation analysis estimated a zero percent recovery on the crime insurance claims, while the Committee's analysis estimated a 100 percent recovery. The court split the difference and concluded that a 50 percent recovery estimate was appropriate, based on the following: (1) Debtor had been successful in receiving money from insurance claims;[6] (2) Mr. Leonard entered into a stipulation under which he agreed to a secured claim to be paid in an amount up to $200,000 from the proceeds of insurance claims; (3) Mr. Leonard would likely aid in pursuing insurance claims; and (4) the inherent uncertainty of insurance claims.

Debtor points to Mr. Leonard's deposition testimony that, under the Committee's plan, the value of the insurance claims would likely be near zero because of the time and expense required to provide proof of loss, and he had expressed uncertainty as to whether he would be willing to assist in

---

[6]According to the Committee, Debtor collected approximately $49,000 on those claims during the pendency of the chapter 11 case.

collecting on the claims.[7] Debtor argues that this testimony renders implausible the bankruptcy court's estimate of a 50 percent recovery in a chapter 7 liquidation. According to Debtor, deducting this recovery from the liquidation analysis (i.e., assuming zero recovery) results in a 24.9 percent distribution to unsecured claims in a hypothetical chapter 7 liquidation. Thus, it argues, Debtor's plan satisfies the best interests test.

We are not persuaded by Debtor's argument. The evidence regarding collectibility of the insurance claims was equivocal at best. The bankruptcy court appropriately drew inferences from that evidence in deciding to split the difference between the Debtor's and the Committee's estimates of what would likely be recovered in a chapter 7 liquidation. Given the deference we afford to the bankruptcy court's factual findings, we are not convinced that the bankruptcy court's estimate of the amount to be collected from the insurance claims–and its ultimate finding of the approximate amount to be

---

[7]When asked whether he would be motivated to work on collecting the insurance claims without Ms. Crews-Vaught's involvement, Mr. Leonard replied:

> I have over $400,000 of time that has not been paid for. I'm not prepared to put in another $400,000 of time to chase the $400,000, particularly if it doesn't look like we're going to collect anything, so I would really have to question whether I should just abandon my claim. Well, I wouldn't totally abandon–I still have a claim as an unsecured creditor so to the extent of the unsecured–that the bankrupt estate gets money from sources other than the insurance, I would still participate in that, but I think the insurance is a tremendous source of payment for all the unsecured creditors, and it would not be under the circumstances you suggest.

recovered by general unsecured creditors in a hypothetical chapter 7 liquidation (48.35 percent)–was illogical, implausible, or without support in the record. And because recovery under Debtor's plan fell short of that amount, the bankruptcy court did not err in finding that it did not meet the best interests test.

**3. The bankruptcy court did not err in finding Debtor's plan not feasible.**

Section 1129(a)(11) requires a plan proponent to show that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." Debtor argues that the bankruptcy court erred in finding that its plan failed to meet this standard.

The bankruptcy court sustained the Committee's feasibility objection to Debtor's plan, in part because it found unpersuasive the testimony of Debtor's financial advisor and expert, Edward D. Burr, Jr., that Debtor would have sufficient cash to fund the plan. Specifically, the court found Mr. Burr's cash flow projections for the first twelve months of the plan to be inconsistent with Debtor's performance during the five months following the conclusion of the confirmation hearing, based on its monthly operating reports. The court also found unpersuasive Mr. Burr's testimony that there would be sufficient cash flow for Debtor to make annual

distributions in years two and three of the plan because it did not take into account the fact that all of the leases with Vaught Equipment were to terminate on or before March 31, 2022, and no evidence of replacement sources of income was presented.

Additionally, the court noted that Debtor's primary revenue stream came from leasing equipment to Vaught Equipment and that Vaught Equipment generated its revenue from subleasing the equipment to Reliant and FARCO. But the Vaughts had refused to disclose to the Committee financial information about any of those related entities, and they did not provide the court with any evidence about the collectibility of the lease payments. The court also cited the fact that Debtor's receivables had increased from approximately $163,000 to $408,000 during the pendency of the chapter 11. Accordingly, the court found that Debtor failed to show that its plan had a reasonable probability of success, particularly in light of its determination that the Vaughts were either incompetent in operating Debtor or had put the interests of themselves and their related entities ahead of Debtor's fiduciary duties to its creditors.

Debtor does not contest the court's underlying findings, but it argues that the court made those findings by relying on five monthly operating reports that were submitted after the close of evidence for the confirmation hearing. It argues that the court should have given Debtor an opportunity to be heard "regarding the content of those operating reports and how they

18

might relate to the evidence presented at confirmation."

We do not find this argument persuasive. The bankruptcy court did not base its feasibility finding solely on the post-trial operating reports. And the other evidence it relied upon fully supported its finding that Debtor had not shown that its plan was feasible. Moreover, Debtor provides no hint as to what its explanation would have been for its post-trial performance. Accordingly, Debtor has not shown that the bankruptcy court's feasibility finding was clearly erroneous.

**4.      The bankruptcy court did not err in sustaining the Committee's objection to Debtor's plan on the ground that the Vaughts' proposed new value contribution was insufficient to satisfy the exception to the absolute priority rule.**

If a plan meets all the requirements of § 1129(a) except for subsection (8) (each class of claims or interests has either accepted the plan or is not impaired under the plan), the plan may be confirmed only if the court finds that it is "fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129(b)(1). To meet this requirement with respect to unsecured creditors, the plan must provide either (1) "that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim" or (2) that "the holder of any claim or interest that is junior to the claims of such class will not

receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115[.]" § 1129(b)(2)(B). This last criterion is known as the absolute priority rule. *Todeschi v. Juarez (In re Juarez)*, 603 B.R. 610, 622 (9th Cir. BAP 2019) (citing *Zachary v. Cal. Bank & Tr.*, 811 F.3d 1191, 1194 (9th Cir. 2016)), *appeal filed*, *Todeschi v. Juarez*, No. 19-60051 (9th Cir. filed Oct. 11, 2019).

An exception to the absolute priority rule permits a junior class to receive or retain property on account of a "new value" contribution, i.e., an offer of "value" to the reorganized debtor that is: (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received. *In re Brotby*, 303 B.R. at 195 (citing *Bonner Mall P'ship v. U.S. Bancorp Mortg. Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 909 (9th Cir. 1993), *abrogated on other grounds by Bullard v. Blue Hills Bank*, 575 U.S. 496 (2015)).

The Vaughts proposed to contribute $140,000 in new value to satisfy the absolute priority rule. The bankruptcy court found that the proposed contribution was not sufficient to allow the Vaughts to retain their equity interests in Debtor. Based on the court's calculation, the Vaughts would need to contribute $150,000. But the court concluded that, even if the Vaughts could contribute that amount, it would not be reasonably equivalent to the value they would retain under their plan. The court

reasoned that, under Debtor's plan, the Vaughts would retain control over an entity with approximately $2.8 million of assets. Further, because Debtor's income is derived primarily from related entities, the Vaughts would also retain control over the flow of money into Debtor, which would give them control over how much money would be distributed to general unsecured creditors. Furthermore, the Vaughts would retain non-monetary benefits from the continued existence of Debtor because Reliant depends on Debtor to obtain government jobs and generate income, and Mr. Vaught owns and presumably generates income from Reliant.

In addition, the court found that there was no verifiable "money or money's worth" available to fund the new value contribution as of the effective date. The new value contribution was to be funded with proceeds from the sale of real property owned by Mr. Vaught's trust, but nothing had been filed with the court to show that the anticipated sale had closed or that the funds would be available as of the effective date.

Debtor argues that the bankruptcy court erred in reaching its conclusion that the proposed contribution was insufficient to satisfy the new value exception. But Debtor's argument deals only with the second factor–that the contribution be substantial. Debtor argues that its proposed contribution is not de minimis, citing *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 655. There, the Ninth Circuit Court of Appeals applied a comparison analysis to determine whether the proposed contribution was

"substantial." The court noted that commentators had observed that the question of whether a new value contribution is substantial may be resolved by: (1) comparing the amount of the contribution to total unsecured claims; (2) comparing the amount of the contribution to the amount of claims being discharged; and/or (3) considering how much of the dividend being paid on unsecured claims would come from the contribution. *Id.* Debtor argues that the proposed contribution represents approximately 9.3 percent of total general unsecured claims, and that this amount is "surely more than de minimis under the circumstances."

But Debtor does not dispute the bankruptcy court's findings regarding any of the other requirements for a contribution to satisfy the new value exception. It does not dispute the bankruptcy court's findings regarding the "money or money's worth" or the "reasonably equivalent" prongs. Accordingly, Debtor has not shown that the court erred in finding that the Vaughts' proposed contribution did not constitute adequate new value to satisfy the absolute priority rule.

Debtor has not shown that the bankruptcy court clearly erred in its findings regarding any of the four elements discussed above. Accordingly, the bankruptcy court did not abuse its discretion in denying confirmation of Debtor's plan of reorganization.

**B.** **The bankruptcy court erred in confirming the Committee's plan without making explicit findings regarding the best interests of creditors test under § 1129(a)(7).**

Section 1129(a)(7) requires that a plan proponent demonstrate, and the court find, that dissenting impaired creditors would receive under the plan property of a value not less than they would receive under a hypothetical chapter 7 liquidation. This test is referred to colloquially as the "best interests of creditors" test. And although, as this case demonstrates, the values assigned to plan recoveries for the purposes of this test may be speculative, and the value assigned to a chapter 7 liquidation for this test is by definition hypothetical, the standard necessarily requires a showing, and a finding–usually via a specific numerical comparison of the expected recovery by general unsecured creditors under the plan to that in a chapter 7 liquidation–that a plan provides not less than the amount to be realized via a chapter 7 liquidation.

As discussed above, the bankruptcy court went to great lengths to analyze the record and create its own liquidation analysis, which estimated the return to general unsecured creditors in a hypothetical chapter 7 liquidation at an arguably somewhat arbitrary, yet numerically precise, 48.35 percent. The court then found that the estimated recovery for general unsecured creditors under Debtor's plan would be 40.75 percent.

Mindful of that precision, contrast the court's treatment of the question whether the Committee's plan met the best interests of creditors

23

test. On this question, the bankruptcy court said, in full:

> The Committee's Plan is a liquidating plan under which the Liquidating Trustee would liquidate the assets of the estate in an orderly manner over time. Although the Committee's Plan may generate less for unsecured creditors than the Debtor's Plan, it necessarily provides holders of claims and interests with full liquidation value, thus satisfying § 1129(a)(7)(A). The Debtor's § 1129(a)(7)(A) objection is therefore overruled.

This determination cannot constitute a proper finding that the Committee's plan met the best interests of creditors test, for the following reasons.

To begin, we do not believe that these comments can fairly be characterized as factual findings, in light of the requirements of § 1129(a)(7). The bankruptcy court made no numerical comparison at all between the Committee's plan and a hypothetical chapter 7 liquidation. Rather, the court seemed to assume that, because the Committee's plan was a liquidating plan, it did not need to determine the estimated return to general unsecured creditors under that plan. But a liquidating chapter 11 plan must conform to the same statutory requirements for confirmation as a chapter 11 reorganization. *United States v. Deer Park, Inc. (In re Deer Park, Inc.)*, 136 B.R. 815, 818 (9th Cir. BAP 1992), *aff'd*, 10 F.3d 1478 (9th Cir. 1993). And it cannot be assumed that a liquidating plan would yield at least as much as a chapter 7 liquidation. *See id.* ("A liquidating plan is desirable when the [plan proponent] can bring about a greater recovery for the

24

creditors than would a straight liquidation under Chapter 7."). *See also In re Colonial BancGroup, Inc.*, No. 09-30323-DHW, 2011 WL 1983997, at \*4-\*6 (Bankr. M.D. Ala. May 20, 2011) (liquidating plan did not meet best interests test because the plan provided for higher fees to be paid to a liquidating trustee than would be incurred by a chapter 7 trustee).

As the quoted authorities state clearly, it was not sufficient to conclude that because the Committee plan called for a liquidation, it necessarily was no less favorable to creditors than liquidation by a chapter 7 trustee. Moreover, the bankruptcy court's "analysis" was inconsistent with the method it used to analyze whether the Debtor's plan satisfied § 1129(a)(7). The bankruptcy court made a specific, and quite precise, numerical finding of the expected recovery under the Debtor's plan, but it did not perform the same analysis of the Committee's plan. Although a precise, numerical calculation of the likely amount to be recovered under a liquidating plan may not always be necessary, and in particular may not have been necessary in this case–as illustrated by the careful and astute analysis set forth in the concurrence–the bankruptcy court articulated no factual basis whatsoever to support its ultimate conclusion that the plan satisfied § 1129(a)(7). This was legal error.

And to the extent that we may treat as a factual finding the court's summary conclusion that the Committee's plan satisfied the best interests test, even that "finding" was completely inconsistent with the court's

statement in the very same "finding" that the Committee's plan may well generate less for unsecured creditors than the Debtor's plan, which demonstrably did **not** satisfy the best interests test. Accordingly, as articulated, this "finding" was illogical and implausible on its face.

Our conclusion on this issue notwithstanding, we have considered whether the record provides a ground upon which we could affirm. *See Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1223 (9th Cir. 1999) (an appellate court may affirm on any ground fairly supported by the record). After due consideration, we are concerned that such an undertaking would in this instance require that we travel a treacherous path, as the record in this case, particularly on this point, is lengthy and inconclusive; and the bankruptcy court's summary conclusions concerning § 1129(a)(7) neither clearly lit the path by specific references to the facts in the record, nor gave enough of a clue to its thinking to constitute breadcrumbs that we might follow to the desired goal. To illustrate, the Committee's feasibility expert, Sandra Obelsky, testified, summarily and without reference to specific items of valuation, that the Committee's plan would generate approximately 47 percent for unsecured creditors.[8] It is not clear whether the bankruptcy court considered or gave weight to that evidence, but even if it based its

[8]Ms. Obelsky was not examined or cross-examined about the assumptions underlying the 47 percent figure, and Debtor did not include her expert report in its excerpts. Debtor's expert did not testify at trial, nor was his expert report included in Debtor's excerpts.

§ 1129(a)(7) conclusion on that testimony, 47 percent is still less than the 48.35 percent it found would be generated in a hypothetical chapter 7 liquidation.

We acknowledge, as the concurrence indicates, that there might have been sufficient evidence before the bankruptcy court to conclude that the best interests test was met here–albeit that evidence would have consisted of a comparison of categories of assets available under the Committee's plan to those available to a chapter 7 trustee, as opposed to a precise numerical calculation of values likely to be achieved. And though we discern no reason why that comparison couldn't sufficiently have supported a finding that the Committee's plan met the best interests of creditors test, we are reluctant to assume that we can, without any indications from the bankruptcy court, "support" a finding that was not expressly made, i.e., the estimated amount to be distributed under the Committee's plan. And as the concurrence illustrates, affirming the bankruptcy court's § 1129(a)(7) finding would require us to perform an extensive analysis of the record that is inappropriate for an appellate court.

At bottom, the determination of whether the best interests test was met is not only factual but requires a framing of the issue and an evaluation of the evidence that should be performed by the bankruptcy court. Accordingly, we must remand for the bankruptcy court to do so.

Finally, because the bankruptcy court did not abuse its discretion in

denying confirmation of Debtor's plan, we need not address Debtor's arguments that the court erred in finding that the Committee's plan was favored by creditors under § 1129(c).

## CONCLUSION

Debtor has not demonstrated error in the bankruptcy court's findings that its plan did not meet the requirements for confirmation under § 1129(a) (5) and (a)(7). Nor has it shown that the bankruptcy court erred in finding that the Vaughts' proposed contribution would not satisfy the new value exception to the absolute priority rule. We therefore AFFIRM the bankruptcy court's order denying confirmation of that plan.

As for the Committee's plan, the bankruptcy court erred in failing to make specific findings regarding the best interests of creditors test of § 1129(a)(7). We therefore VACATE the order confirming the Committee's plan and REMAND for further proceedings in accordance with this disposition.

Concurrence begins on next page.

TAYLOR, Bankruptcy Judge, concurring.

I join as to the results in this appeal. I write separately because my reasoning as to the decision to vacate and remand is different. I acknowledge that the bankruptcy court erred in failing to expressly find that the Committee's plan satisfied § 1129)(a)(7). But we may affirm for any reason set forth in the record. *Caviata Attached Homes, LLC v. U.S. Bank, Nat'l Ass'n (In re Caviata Attached Homes, LLC)*, 481 B.R. 34, 44 (9th Cir. BAP 2012). Absent a single fact in the record, I would find the error harmless.

Here, the bankruptcy court confronted competing plans. In evaluating Debtor's plan it performed its own detailed liquidation analysis and reached the conclusion that a chapter 7 liquidation would yield 48.35 percent to unsecured creditors. It then concluded that Debtor's plan would yield only 40.75 percent and made a specific finding that Debtor's plan failed the best interest of creditors test.

In connection with the Committee's plan, however, the bankruptcy court's findings were truncated and non-specific. I produce them in full:

> The Committee's plan is a liquidating plan under which the Liquidating Trustee would liquidate the assets of the estate in an orderly manner over time.[49] Although the Committee's plan may generate less for unsecured creditors than the Debtor's plan, it necessarily provides holders of claims and interest full liquidation value, thus satisfying § 1129(a)(7)(A). The Debtor's § 1129(a)(7)(A) objection is therefore overruled.
>
> [49] Under the Committee's plan the liquidation trustee would assume

1

profitable leases, but all of Debtor's unexpired leases expire on or before March 31, 2022 and would not be renewed.

Before the bankruptcy court, Debtor focused on the assertion that a chapter 7 liquidation would yield only a minimal result, set in its post-trial briefing at 17.4 percent. This argument applies to any non-debtor liquidation and is not relevant to a § 1129(a)(7) comparison between the Committee Plan and a chapter 7 liquidation. Otherwise Debtor also baldly stated both before the bankruptcy court and on appeal that a liquidation under the Committee's plan would generate administrative expenses exceeding those in a chapter 7 liquidation and that no evidence supported the conclusion that the Committee's plan met the best interest of creditors test. Its assertions, however, were unsupported by any evidence or even analysis. I confess that this argument, while not well-supported, is not frivolous.

First, recall that the bankruptcy court found that Debtor's plan would provide a 40.75 percent recovery and that in a hypothetical chapter 7 liquidation, the recovery would be 48.35 percent. So, if, as stated in the findings, the Committee's plan may yield less than 40.75 percent (the determined recovery under Debtor's plan) it necessarily would generate less than a hypothetical chapter 7 liquidation as previously determined by the bankruptcy court. Second, I agree with my colleagues that the offhand suggestion that a chapter 7 liquidation and a liquidation outside of

chapter 7 necessarily yield the same proceeds is erroneous. And third, a review of the docket discloses that the Committee provided evidence in its post-trial briefing that its plan would yield a 47 percent recovery for creditors. My colleagues find that each of these factors support and require that we vacate and remand. For me, it is a closer call—only the last point convinces me that this is not a case of harmless error.

First, I carefully considered the liquidation analysis that the bankruptcy court performed. In virtually all respects, it relies on recoveries that would not deviate if the liquidation was performed by the Committee as opposed to a liquidating chapter 7 trustee.

For example, the bankruptcy court's explanation for its anticipated recovery on other items generally reflects agreement between the Committee and Debtor (*e.g.*, the prepaid expenses recovery) or an analysis that no one suggests would be different if assets are liquidated in the hands of the Committee as opposed to the chapter 7 trustee.

Also, the amount of secured debt and liquidation expenses—the major deductions from any recovery—would not vary depending on who liquidated the assets. There is nothing in the record to suggest a different conclusion; Debtor does not so argue.

I am then left with only three areas of possible differential. I consider them in turn.

First, a liquidation by the Committee would avoid the trustee's

$76,906.47 statutory commission. This mandates a determination that the Committee's liquidation would avoid a significant cost and supports a determination that the Committee's plan passes the best interest of creditors test.

Second, as Debtor argues, the administrative cost of liquidation could be different under the Committee's plan. Debtor and the Committee agree that a chapter 7 liquidation would generate approximately $75,000 in administrative fees; the bankruptcy court adopted this number in its liquidation analysis. But Debtor advances no specific argument as to comparative administrative costs under the Committee's plan. As discussed below, the Committee's plan differs only in that it expressly allows a liquidation that takes advantage of profitable short-term leases. Given the "cushion" provided by the absence of chapter 7 trustee's fees, I cannot conclude that this unsupported supposition requires that the order confirming the Committee's plan be vacated.

Finally, the Committee's plan provides for a continuation of Debtor's business for the limited purpose of collecting rent and performing leases where to do so is profitable. So another question becomes: Is this a deviation from a probable chapter 7 liquidation that necessarily, or even potentially, supports the conclusion that a liquidation under the Committee's plan will yield less than in chapter 7 liquidation? I conclude that the answer to this question, based solely on the record before us and

4

the only arguments made or evidence advanced by Debtor, is no.

The Committee's plan hits the pause button on equipment liquidation and allows for assumption of profitable leases. Because all Debtor's leases terminate on or before March 31, 2022, the Committee's plan does not significantly delay liquidation of the equipment subject to profitable leases. And in the case of an unprofitable lease, the Committee's plan provides for immediate rejection and sale of the related equipment.

The bankruptcy court's liquidation analysis appears to assume immediate rejection of all leases followed by prompt sale of all equipment. But, a chapter 7 trustee could also elect to operate Debtor's business and collect on performing and profitable leases. *See* § 721 ("The court may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate.") Here, no evidence in the record suggests that collection of rent on profitable leases over a short period of time is not in the best interest of creditors.

Based on the above, most evidence in the record supports that a liquidation under the Committee's plan would be at least as desirable as a liquidation in a chapter 7 case. First, the Committee's plan avoids the chapter 7 trustee commission. Second, there is no evidence that the costs of liquidation under the Committee's plan would vary significantly from the $75,000 anticipated in a chapter 7 liquidation. And, again, there is a more

5

than $76,000 cushion available here. Finally, while it is unclear that the collection on leases would not occur in a chapter 7 context, the Committee's plan assumes that the lease collections will continue only to the extent they yield positive dollars.

Having disposed of the only differences I can see between a chapter 7 liquidation and the proposed Committee's plan liquidation, however, hurdles remain.

I can acknowledge the bankruptcy court's statement that liquidation under the Committee's plan might yield less than under Debtor's plan without assigning error; I assume that the bankruptcy court was not acknowledging that the Committee's plan would likely or even potentially yield less than in a chapter 7 liquidation. The careful treatment of § 1129(a)(7) issues in connection with the Debtor's plan evidences clear understanding of the best interest of creditor's test requirements. Instead, I conclude that the bankruptcy court was responding to Debtor's argument of superior recovery under its plan and stating that in a § 1129(a)(7) context, even if Debtor was correct, it was of no moment. In short, I logically assume that in this statement the bankruptcy court was not comparing the Committee's plan's liquidation recovery to a chapter 7 liquidation.

But there is a hurdle I cannot surmount. In order to get to the point of possible affirmance, I necessarily dove deep into the record and docket.

6

And I also necessarily made assumptions consistent with the evidence and in light of the lack of contrary evidence from Debtor. But in so doing, I must also deal with evidence supplied by the Committee itself that supports an unsecured creditor recovery of only 47 percent under its plan. This calculation supports that the Committee's plan would yield less than a chapter 7 liquidation given the bankruptcy court's determination of a 48.35 percent recovery in a chapter 7.

This fact is far from dispositive and might not bar affirmance. But, absent a finding by the bankruptcy court, I cannot disregard directly contrary evidence supplied by the Committee and engage in overt fact finding and the weighing of evidence; the bankruptcy court must make such a factual determination on remand.